**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**MARK KILCREASE-TIGER, Individually and**                       **PLAINTIFF**
**on Behalf of All Others Similarly Situated**

**V.**                               **NO. 4:19-CV-798-DPM**

**WELSPUN PIPES, INC.; WELSPUN**                          **DEFENDANTS**
**TUBULAR, LLC; and WELSPUN USA, INC.**

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Welspun Pipes, Inc., Welspun Tubular, LLC and Welspun USA, Inc. (Defendants), by and through their undersigned counsel, and for their Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, state:

## I.   INTRODUCTION

Plaintiff Mark Kilcrease-Tiger ("Plaintiff") filed this lawsuit claiming unpaid overtime compensation pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. and the Arkansas Minimum Wage Act (AMWA). Plaintiff specifically alleges that he was misclassified by Defendants as exempt from overtime, and he seeks this relief individually because no collective action class was ever certified. Plaintiff's claim is seemingly limited to whether he was afforded the authority to hire, fire, or effectively recommend the same as required by the FLSA's Executive exemption. The objective evidence available, taken in the light most favorable to Plaintiff, shows that no genuine issue of material fact exists, and Defendants' are entitled to summary judgment on all claims.

For the reasons contained in Defendant's Motion for Summary Judgment, Statement of Undisputed Facts, and this Brief in Support, Plaintiff's Complaint should be dismissed in its entirety pursuant to Fed. R. Civ. P. 56.

## II.    FACTS

Welspun Tubular, LLC ("Welspun")[1]  operates a multi-department facility in Little Rock, Arkansas.   Declaration of Ragesh Sheth, ¶ 2, attached to Defendant's Motion for Summary Judgment as Exhibit 2.   Welspun's Little Rock facility, which began operating in 2009, manufactures high-grade line pipes that carry oil, gas, sand oil, water, and other materials. Plaintiff is a former employee of Welspun Tubular, LLC. Neither Welspun Pipes, Inc. nor Welspun USA, Inc. have ever employed Plaintiff.  *See id*. at ¶ 4.

Welspun has a Handbook that it provides to each of its employees.  *See* Welspun Handbook Excerpts, attached to Defendant's Motion for Summary Judgment as Exhibit 9.   The Handbook informs employees that all jobs are classified as either exempt or non-exempt, and that exempt employees do not receive overtime.  *See id*. at p. 2.   It also informs salaried employees that their salary is intended to compensate them for all hours worked and that their pay will not be reduced due to quantity or quality of work performed.  *Id.* at p. 3.  All employees, including Plaintiff, received a copy of the Handbook upon hire.  Sheth Dec., ¶ 5.

**Welspun's Coating Plant and Quality Control Department**

Welspun's Little Rock facility is a significant operation with a footprint spanning hundreds of acres.  The facility creates various sizes of industrial pipes, which can weigh nearly of 60,000 pounds, and the pipes move through Welspun's facility on tracks among various departments.  Sheth Dec., ¶ 2.  Welspun's Coating Plant takes manufactured pipes that are ordered by customers to be coated for various purposes and by various specifications.  *Id.* at ¶¶ 6-7.  The Coating Plant has two departments: Production and Quality Control.  *Id.* at ¶ 3. Both departments run on four shifts (A-D), and each shift has a designated Supervisor.  *Id*.

---

[1]  Separate Defendants Welspun Pipes, Inc. and Welspun USA, Inc. deny that they were Plaintiff's "employer" within the meaning of the FLSA and/or AMWA.  *See* Section IV.D, *infra*.

There are anywhere from 10-25 employees, two of which are non-exempt Team Leads, on each shift that all report to the shift Supervisor.  *Id*.  QC Supervisors are authorized to adjust employees' work assignments, discipline employees, ensuring sufficient equipment is available, and are responsible for evaluating employees' performance. Sheth Dec., ¶¶ 6-7; *see* Declaration of Kaushik Rana, ¶¶ 5-8, 11, attached to Defendants' Motion for Summary Judgment as Exhibit 3; Declaration of Blake Alban, ¶¶ 5-8, 11, attached to Defendants' Motion for Summary Judgment as Exhibit 4.

The Coating Plant operates twenty-four hours every day. Sheth Dec., ¶ 3.   The Quality Control department ensures the pipes that come through during that shift meets or exceeds both Welspun's and industry standards as well as its customers' particular specifications.  *Id*.; Rana, ¶ 6; Alban, ¶ 6. If the Quality Control department finds any defects or issues with a pipe, it returns it back to Production for correction.  *Id*.  The decision by Quality Control to return a pipe back to production incurs additional costs and revenue loss because it reduces the productivity of the Coating Plant.  Sheth Dec., ¶ 8.

**Plaintiff's Role in Welspun Tubular, LLC's Quality Control Department**

Plaintiff worked as a Quality Control Supervisor (QC Supervisor) in the Quality Control department within the Coating Plant at Welspun's Little Rock facility.  *See* Deposition of Mark Kilcrease-Tiger, p. 24:21-23, attached to Defendants' Motion for Summary Judgment as Exhibit 1 (Tiger Dep.); *see also* Job Description, attached to Defendants' Motion for Summary Judgment as Exhibit 6.  Plaintiff was hired in November 2018 as an exempt employee earning an annual salary of $65,000.  *See* Tiger Dep., p. 19:8-18.  He worked in this same position for the same salary from November 2018, until he was terminated in September 2019, which was approximately 10 months. *Id*. at pp. 9:7-15; 19:8-18.  Neither his pay nor his duties changed during his employment.  *Id*. at p. 62:7-13.

Plaintiff received training from Welspun upon being hired. Sheth Dec., ¶ 5. The trainings included Basic Supervisory Training that trained him on supervisory skills such as how to document employees for discipline and performance issues. *See* Tiger Dep., pp. 26:14-27:5. He was also required to complete a multi-part Emerging Leaders Program through Pulaski Technical College, which was provided to Welspun's supervisors and managers. *Id*. at 31:13-35:8. He received a Level I Supervisory Management certification from Pulaski Technical College upon the completion of that Program in February 2019. *Id*. at p. 35:1-8; *see* Training Certificates, attached to Defendants' Motion for Summary Judgment as Exhibit 5.

Plaintiff reported to the Quality Control Department's Manager, Ragesh Sheth. Tiger Dep., pp. 23:25-24:23. His duties included, among others, ensuring that all planned production, inspection, and testing was performed to standards on his shift in the Quality Control Department. *Id*. at p. 37:9-17; *see also* Job Description, Exhibit 10. He was also responsible for ensuring the entry of data, that all process control parameters were completed, confirmed the use of calibrated instruments by his team, and maintaining discipline, proper housekeeping, and safety for employees on his shift. *Id*. at pp. 37:18-38:6. Plaintiff was responsible for the safety of his shift's team members. *Id*. at p. 63:22-24.

Plaintiff's typical shift began with him meeting with the outgoing shift Supervisor to get a report on any issues that arose or that may have been ongoing for the start of his shift. Tiger Dep., pp. 40:1-41:16. He, like other QC Supervisors, would "walk the floor" multiple times each shift to ensure employees on his team were doing their jobs appropriately, ensuring personal protective equipment was being worn, and that processes were running properly. *Id*.; *see also* Rana Dec., ¶¶ 5-7; Alban Dec., ¶¶ 5-7. Ultimately, Plaintiff and his shift were responsible for inspecting and ensuring that the pipes were properly sanded and cleaned in preparation for the actual coating process. Tiger Dep., p. 42:9-23. Essentially, the Production department cleaned

the pipes, and Quality Control inspected their work.  *Id.* at p. 45:5-15.  Plaintiff would be reprimanded if a pipe left his department with defects that should have been caught by his team. *Id.* at p. 61:5-15.

Plaintiff was responsible for ensuring that the personnel on his shift were doing their jobs properly.  Tiger Dep., p. 43:9-23.  He spent most of his shift walking around and checking on his team.  Id. at pp. 53:24-54:3; p. 67:7-14; *see also* Rana Dec., ¶ 7; Alban Dec., ¶ 7. Plaintiff supervised approximately 20 personnel on his shift.  Tiger Dep., pp. 44:22-45:1. If someone did not show up for a scheduled shift, Plaintiff was authorized to re-assign job assignments to ensure all work was covered. *Id.* at pp. 65:22-66:2. Plaintiff agrees that he was responsible for directly supervising the members of his team and ensuring productivity.  *Id.* at pp. 98:1-100:1.

Plaintiff himself also performed quality inspection on the pipes.  Tiger Dep., p. 44:5-14. Supervisors were required to perform two pipe inspections themselves each shift to ensure proper calibration of tools, processes, and chemicals.  *Id.* at p. 67:23-25; *see* Rana Dec., ¶ 10; Alban Dec., ¶ 10.  The reason for his test, as the Supervisor, was to ensure that the employees on his shift were accurately testing the pipes.  *See* Tiger Dep., pp. 95:1-96:9; Alban Dec., ¶ 10 ("These tests were for auditing, not conducting.").  If the tests were not done properly, Plaintiff would review the pipes that had been tested on his shift.  *Id.*  Plaintiff and his counterpart in the Production department would determine whether to request a shutdown of testing or continue running the pipes on schedule.  *Id.* 97:13-22.  The decision to stop operations resulted in significant financial harm to Welspun. Sheth Dec., ¶ 8.

Plaintiff was also responsible for entering the data at the end of his shift, which only Supervisors could input. Tiger Dep., p. 48:11-19; p. 52:12-20. If his department was backlogged, Plaintiff was responsible for his shift's productivity.  *Id.* at pp. 55:10-56:20. As a QC Supervisor, Plaintiff also approved vacation requests from members on his team.  Tiger Dep., p. 84:4-22.  He

had authority to approve or deny those requests.  *Id.*; *see* Sheth Dec., ¶ 14.  It was his job to ensure that his shift was adequately staffed.  *Id.*

Plaintiff also disciplined employees on his shift for various performance violations. Tiger Dep., pp. 70:3-78:12; *see* Employee Discipline Forms, attached to Defendants' Motion for Summary Judgment as Exhibit 7.  He verbally counseled them and documented the incidents to their personnel files.  *Id.*  He also instructed those employees that further violations would result in termination of employment.  *Id.*  On the other hand, he would give input into his employees' performance when asked by his Manager for consideration in promotions, which would be given strong consideration.  *Id.* at pp. 103:-104:7; *see* Sheth Dec., ¶¶ 12-13.

Plaintiff also sent incident reports to the Quality Control Manager, Ragesh Sheth, and other administrators.  Tiger Dep., pp. 78:15-80:17; *see* Employee Correspondence, attached to Defendants' Motion for Summary Judgment as Exhibit 8.   Plaintiff sent at least two employees home for safety infractions and insubordination on his shift.  *Id.*  On one occasion, Plaintiff sent his entire overnight shift home early due to a production issue.  *Id.* at pp. 85:1-86:21; *see* also Exhibit 8, p. 5.

### III.  LEGAL STANDARDS

Summary judgment may be granted if no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(c); *Andrews v. Fowler*, 98 F.3d 1069, 1074 (8th Cir. 1996).  "[T]he plain language of Fed. R. Civ. P. 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case," and as such a failing necessarily renders all other facts immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   Consequently, summary judgment should be granted where no reasonable jury could find in favor of the non-movant on any one

fact essential to its claim.  *Diesel Machinery, Inc. v. B.R. Lee Industries, Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (citations omitted); *Depositors Ins. Co. v. Wal-Mart Stores, Inc.*, 506 F.3d 1092, 1094 (8th Cir. 2007) (citing *Anderson*, 477 U.S. at 248).

Once a motion for summary judgment points out the absence of proof regarding an essential element of the non-movant's case, the burden shifts to the non-movant to offer probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy.  *Gregory v. City of Rogers, Ark.*, 974 F.2d 1006, 1010 (8th Cir. 1992), cert. denied, 507 U.S. 913 (1993).  The non-movant's evidence must raise more than "some metaphysical doubt" to withstand a motion for summary judgment.  *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Fed. R. Civ. P. 56 requires that a response, by affidavits or other evidence, specifically show that there is a genuinely disputed issue of material fact.  *Jackson v. Anchor Packing Co.*, 994 F.2d 1295, 1304 (8th Cir. 1993) (citing *Celotex*, 477 U.S. at 322).

A plaintiff may not create a material issue of fact solely based upon his own self-serving, unsubstantiated testimony contained in his affidavit or deposition.  *O'Bryan v. KTIV Television*, 64 F.3d 1188, 1191 (8th Cir.1995) (granting summary judgment if non-moving party's only evidence to rebut the motion is conclusory, self-serving statements made in affidavit).  Nor may the non-movant in a summary judgment motion rest upon the mere allegations of his or her pleadings.  *Robinowitz v. Gibraltar Savings*, 23 F.3d 951, 954 (5th Cir. 1994).  *Id*.  It is well-settled that conclusory evidence or statements, rather than factual statements, are insufficient to support a response to a motion for summary judgment.  *Jackson*, 994 F.2d at 1304; *see also Rose-Maston v. NME Hosp., Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998); *Luciano v. Monfort, Inc.*, 259 F.3d 906, 910 (8th Cir. 2001) (citation omitted); *Weger v. City of Ladue*, 500 F.3d 710, 728 (8th Cir. 2007).

Not only must the non-movant support each essential element of his or her claim with evidence, but evidence that does not support an essential element of the non-movant's claim is irrelevant to deciding a motion for summary judgment. *Hervey v. County of Koochiching*, 527 F.3d 711, 719 (8th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). Evidence that does not support the non-movant's claim but simply demonstrates the existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment. *Bloom v. Metro Heart Group of St. Louis, Inc.*, 440 F.3d 1025, 1028-1029 (8th Cir. 2006) (citing *Anderson*, 477 U.S. at 247-48).

Modern federal courts "should be somewhat more hospitable to summary judgments" than they were prior to *Celotex*, *Anderson*, and *Matsushita*. *City of Mount Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). *See e.g. Stever v. Independent School Dist. No. 625*, 943 F.2d 845, 854 (8th Cir. 1991) (citing *Mount Pleasant*, 838 F.2d at 273-74). "The motion for summary judgment can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those cases that really do raise genuine issues of material fact" and "need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." *Id*.; *Krenik v. County of Le Sueur*, 47 F.3d 953, 959 (8th Cir. 1995) (citations omitted).

## IV.   ARGUMENT

Plaintiff asserts that he was misclassified as exempt under the FLSA. In support of his claims, Plaintiff attempts to cast himself as a "laborer" with no real supervisory authority or administrative discretion. His own self-serving allegations are insufficient to establish a viable claims, especially given the amount of evidence to show that his job position did, in fact, perform all necessary supervisory and/or administrative functions necessary to qualify as exempt under the FSLA and AMWA. Thus, Plaintiff's claim fails to survive scrutiny pursuant to Fed. R.

Civ. P. 56(c), and Defendants are entitled to summary judgment on each of their individual claims. Assuming, *arguendo*, that Plaintiff is owed any overtime at the trial of this matter, such wages should be calculated by the fluctuating workweek method. Further, Defendants Welspun Pipes, Inc. and Welspun USA, Inc. never employed Plaintiff and must be dismissed.

### A.  The Evidence Demonstrates that Plaintiff Was Properly Classified as an Exempt Employee.

Summary judgment is appropriate for dismissing Plaintiff's overtime claim under the Fair Labor Standards Act ("FLSA") and the Arkansas Minimum Wage Act ("AMWA"). *Jarrett v. ERC Props.*, 211 F.3d 1078, 1081, (8th Cir. 2000). The FLSA establishes that employers must compensate each employee "at a rate not less than one and one-half times the 'regular rate' for all overtime hours that an employee works." 29 U.S.C. § 207(a)(1). The FLSA defines overtime as employment in excess of forty (40) hours in a single workweek. *Id.* The AMWA is interpreted under the same standards as the FLSA. *See Aubrey v. Zamam, LLC*, No. 2017 WL 5180427, at *2 (E.D. Ark. Nov. 8, 2017).

The FLSA and AMWA both exempt from this general rule "any employee employed in a bona fide <u>executive</u>, <u>administrative</u>, or professional capacity . . . ." *Id.* § 213(a)(1) (emphasis added); Ark. Code Ann. § 11-4-211(d) (directing that AMWA overtime requirements do not apply to employees exempt under the FLSA exemptions). Certain federal regulations set forth various parameters of the exemptions. 29 C.F.R. § 541.200 *et seq*. The Supreme Court has rejected the principle that exemptions should be construed narrowly when interpreting the FLSA. "Because the FLSA gives no textual indication that its exemptions should be construed narrowly, there is no reason to give [them] anything other than a fair (rather than a narrow) interpretation." *Encino Motorcars*, 138 S. Ct. at 1142.

The QC Supervisor position at Welspun satisfied the requirements of the Administrative and Executive exemptions, as well as a combination thereof.  As such, Plaintiff is not entitled to overtime compensation under either federal or state law.

    1.    <u>Plaintiff was Exempt Pursuant to the Administrative Exemption's Duties Test</u>.

To qualify for the FLSA's administrative exemption, an employee must: (1) be compensated on a salary basis at a rate of not less than $455 per week[2]; (2) be an employee whose primary duty is the performance of office or non-manual labor directly related to the management or general business operation of the employer or its customers; and (3) be an employee whose primary duty included the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a).  Plaintiff's compensation and job duties while employed with Welspun satisfies each of these criteria.  As such, he was properly classified as exempt.

        a.    *Plaintiff Meets the Salary Basis Requirement.*

The first prong of the administrative exemption requires that an employee be compensated on a salary basis at a rate of not less than $455 per week. 29 C.F.R. § 541.200(a)(1).  As a general rule, "[a]n employee will be considered to be paid on a 'salary basis' which amount is not subject to reduction because of variations in the quality or quantity of work performed." 29 C.F.R. § 541.602.

Plaintiff was paid a pre-determined annual salary of $65,000.  Tiger Dep., p. 19:8-18; *see* New Hire Form, attached to Defendants' Motion for Summary Judgment as Exhibit 6.  This pay was communicated to him prior to his employment and did not change.  *See* Exhibit 9, p. 4.

---

[2] This amount increased to $684 per workweek effective January 1, 2020. *See* 84 Fed. Register 51230 (Sept. 27, 2019). Plaintiff's employment terminated in 2019, thus the applicable salary basis minimum is $455 for purposes of this litigation.

Thus, Plaintiff was compensated on a salary basis at a rate greater than $455 per week, which he admits.  *See* ECF No. 1, ¶ 46.   There is no genuine issue for trial concerning 29 C.F.R. § 541.200(a)(1), and the first requirement of the administrative exemption is easily met on these facts.

> b.   *Plaintiff Worked in a Non-Manual Position Directly Related to Welspun's Business.*

The second prong of the administrative exemption requires that an employee's primary duty "is the performance of office or non-manual labor directly related to the management or the general business operation of the employer or its customers." § 541.200(a)(2). The term "primary duty" means the "principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700(a).  The regulations indicate that amount of time devoted to exempt work is a helpful factor and that generally, if employees allocate 50 percent of their time performing exempt work, the primary duty requirement will be satisfied. *Id.*  Notably, "whether [employees'] particular activities excluded them from the overtime benefits of the FLSA is a question of law." *Grage v. N. States Power Co.-Minnesota*, 813 F.3d 1051, 1054 (8th Cir. 2015)(alteration added).

To satisfy this requirement, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). The regulations explicitly state that "work directly related to management or general business operations includes, but is not limited to, work in functional areas such as . . . *quality control*; *personnel management*; . . . [or] *legal and regulatory compliance* . . . ." 29 C.F.R. § 541.201(b) (emphasis added); *see also Vazquez v. Navistar Int'l Transp.*, 2012 U.S. Dist. LEXIS 45107 (N.D. Ind. Mar. 30, 2012) (concluding that employee who verified whether employer's suppliers were delivering commodities in accordance with employer's requirements

was primarily engaged in non-manual quality control and, thus, exempt pursuant to the administrative exemption).

When deciding the employee's primary duty, it "must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Grage*, 813 F.3d at 1055. The following factors may be considered: "relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed." *Id.* "The phrase 'directly related to the management or general business operations' refers to the *type of work* performed by the employee." *Id.* (citing 29 C.F.R. § 541.201(a) (emphasis added)). Also, "if an employee is simply performing "work that is 'ancillary to an employer's principal production activity,' [the] employee[ is] administrative." *Id.* (alterations in original).

Here, there is no real dispute that Plaintiff's primary duty was that of quality control. The very nature of quality control, which Plaintiff admits he did, is to ensure the quality of the pipes produced by Welspun. *See* Tiger Dep., pp. 37:9-17; 42:9-23; *see also* QC Supervisor Job Description, p. 1, Exhibit 10 (listing "Responsibilities and Accountabilities"). The various testing stations that Plaintiff's team members operated were solely for the purpose of testing the quality of the pipe; they had no attributes of production. In fact, the Coating Plant had a separate department entirely devoted to Production. Tiger Dep., p. 45:5-15; *see* Sheth Dec., ¶¶ 3, 9; Rana Dec., ¶ 3; Alban Dec., ¶ 3. As stated, Plaintiff was ultimately responsible for his team's work product and he was not required to perform the same tasks as his team members who actually conducted the testing. Sheth Dec., ¶

Furthermore, the work performed by Plaintiff was, without question, directly related to the general business operations of Welspun. This factor should go without challenge given the fact that Plaintiff candidly admits he was responsible for the quality of pipe that went through his department and ensuring that Welspun's customers' specifications were met. Tiger Dep., p. 42:9-23; p. 45:5-15; *see* Sheth Dec., ¶ 7. Also, Plaintiff performed his work without any supervision. Sheth Dec., ¶ 11. Often times, he worked evening, morning, and night shifts without any on-site management present. Viewing the "character of [Plaintiff's] job as a whole[,]" it is evident that he performed non-manual labor directly related to the general business operation of Welspun. *Grage*, 813 F.3d at 1055 (alterations supplied).

Plaintiff contends that he spent too much time performing "non-supervisory duties" that he considered outside of his "supervisory role." Tiger Dep., pp. 104:24-105:12. Importantly, his contention that this "fill-in" work (when he stepped in for his team members' work stations to keep production going) violated his exemption under the FLSA essentially ratifies that his Supervisor duties were, in fact, exempt duties. Nonetheless, Plaintiff's own admission was that he spent "on average, maybe two, three hours" per shift on such work. *Id*. at p. 115:7-17. This testimony, in light of his regularly-scheduled 12-13 hour shifts[3] comes nowhere near a 50 percent threshold or anything else detracting from the character of his Supervisor position. *See id*. at p. 107:20-23 (stating he was scheduled for 12-hour shifts); p. 52:1-3 (stating he always worked at least an hour over entering data and reports at the end of a shift).

Moreover, Plaintiff's contention of what constitutes "non-supervisory duties" does not comport with the FLSA's standards. Manual labor is work involving physical skill and energy and repetitive operations with the hands. 29 C.F.R. § 541.3(a). When asked for examples of such

---

[3] Welspun would dispute these hours at trial, but for purposes of summary judgment Plaintiff's own testimony is being afforded the most favorable light.

13

duties, Plaintiff stated that performing quality inspection tests, staring at a monitor, and entering data into a computer to be "physical labor" rather than supervisor work.  Tiger Dep., pp. 119:19-120:9.  As such, even by his own estimate of averaging two or three hours per shift doing "physical labor," those totals would not be comprised of the kind of work that would cause his job position to lose its Administrative exemption under the FLSA.  To be sure, QC Supervisors do not perform manual labor (as contemplated by the FLSA) in their daily tasks.  *See* Sheth Dec., ¶ 9; Rana Dec., ¶ 12; Alban Dec., ¶ 12.

In sum, taking the totality of his own description of job functions at Welspun, Plaintiff clearly performed non-manual work that was directly related to Welspun's general business operations.  The second prong of the administrative exemption is easily satisfied.

       *c.*    *Plaintiff Regularly Exercised Discretion and Independent Judgment.*

The third prong of the administrative exemption requires an employee's primary duty to involve the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a)(3).  "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). The regulations make evident the fact that an employee is supervised or is required to work within guidelines does not undermine the exempt status:

> The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review.

29 C.F.R. § 202(c); *see also Viola v. Comprehensive Health Mgmt.*, 441 Fed. Appx. 660, 2011 WL 4436589 (11th Cir. 2011)(concluding an employee exempt pursuant to the administrative exemption even though she was "required to submit most of her plans to management before they were finalized . . . .").

"The term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 202(a). The regulations set forth numerous factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance, including, but not limited to:

1. whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;

2. whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;

3. whether the employee has authority to commit the employer in matters that have significant financial impact;

4. whether the employee investigates and resolves matters of significance on behalf of management.

29 C.F.R. § 541.202(b).   On the of use instructive materials for assistance in exercising discretion and independent judgment, the interpretive regulations provide that:

The use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption under section 13(a)(1) of the Act or the regulations in this part.

29 CFR 541.704; *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir. 2003)("Just because McAllister was required to follow detailed manuals does not mean she

did not exercise discretion and independent judgment."). Finally, courts should apply the phrase "discretion and independent judgment" in light of all the facts involved in a particular employment situation. 29 C.F.R. § 541.202(b).

While there is not a wealth of case law analyzing the exempt status of employees similar to Plaintiff, instructive authority exists. In *Ashworth v. E. B. Badger & Sons Co.*, the court concluded that an employee's work in determining whether fabricated pipes met certain plans and specifications required the exercise of discretion and independent judgment. 63 F. Supp. 710 (D. Mass. 1945); *see also Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 374 (7th Cir. 2005) (reasoning that the plaintiffs' exercise of discretion may be channeled by applicable regulations without defeating the existence of sufficient discretion).

In *Brock v. On Shore Quality Control Specialists*, the plaintiffs were employed as inspectors to perform quality control measures on oil and gas pipelines. 1987 WL 31308 (W.D. Tex. Sept. 29, 1987). The plaintiffs' primary duty was to inspect whether the pipe welds meet the minimum standards set forth by the American Petroleum Institute. *Id.* at *3. Numerous inspectors testified at trial, stating that they inspected the welds on the pipeline, interpreted images to determine if the weld was suitable, and decided if a weld passed inspection. *Id.* at *4. Inspectors testified that it was part of their job duties to deduce whether the welds were in compliance with the standards of the American Petroleum Institute. *Id.* at *4.

The *Brock* court concluded that the inspectors were exempt employees pursuant to the administrative exemption. As to the issue of manual labor, the court, directly, stated: "There is no question that the primary duty of all the inspectors at issue consisted of performance of non-manual work directly related to management policies or general business operations . . . ." *Id.* at *7. The court, as to independent judgment and discretion, also concluded that by determining whether the contractor's welds were in compliance with all applicable requirements, the weld

inspectors were exercising independent judgment and discretion. *Id*. The court rejected plaintiffs' argument that the technical guidance provided by the standards of the American Petroleum Institute removed the requisite independent judgment and discretion. *Id*. at *8.

In similar fashion, in *O'Dell v. Alyeska Pipeline Service Co.*, the Ninth Circuit held that field inspectors of a pipeline were exempt administrative employees who exercised independent judgment and discretion in their job duties. 856 F.2d 1452, 1454 (9th Cir. 1988). Common to Plaintiff in this case, the field inspectors in *O'Dell* determined whether work "failed to satisfy minimum standards," and made "recommendations" for appropriate action. *Id.* at 1454.

Here, despite Plaintiff's effort to downplay his job duties and claim, there is still ample and sufficient evidence that they exercised discretion and independent judgment with respect to matters of significance. Specifically, Plaintiff was tasked with the responsibility to undertake the significant task of discerning whether Welspun's pipes complied with industry and customer standards. This was undoubtedly a matter of great significance in Welspun's operations and, if a pipe were to be released with defects, would result in significant financial harm to Welspun. To meet these responsibilities, Plaintiff was naturally required to exercise considerable discretion and independent judgment.

First, Plaintiff was authorized to determine whether any quality issue was sufficient to shut down production at the Coating Department or that it could continue. Tiger Dep., p. 97:17-22. This authority evidences a significant amount of discretion in itself. Shutting down production results in loss of productivity and, thus, revenue. Sheth Dec., ¶ 8. Plaintiff himself sent his entire team home less than halfway through a shift due a temporary shutdown on a production line. *See* Tiger Dep., pp. 85:1-86:21; *see also* Exhibit 8, p. 5.

Second, according to his own testimony, when Plaintiff arrived to work, he would concur with the outbound QC Supervisor and sign off about any problems, and then he would "walk

around the building, checking each station to make sure somebody was operating there and that nothing was broken." Tiger Dep., p. 37:17-24; *see Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 535-536 (7th Cir. 1999) ("Supervisory and training responsibilities, for example, are evidence of duties that are administrative in nature."); *Claes v. Guard Publ'g Co.*, 2001 U.S. Dist. LEXIS 12840, 14 (D. Or. Mar. 22, 2001) ("Supervision of others is a quintessential discretionary function."). Plaintiff clearly explains how his job as QC Supervisor required that he ensure his team members were properly performing their work assignments. *See* Tiger Dep. p. 43:9-23; pp. 44:22-45:1; 53:24-54:3; p. 67:7-14. He was also ultimately responsible for the quality of pipes sent through his shift and would be personally reprimanded for allowing a pipe to fall below standards. *Id*. at p. 61:5-15. He was also responsible for the safety of his team. *Id*. at p. 63:22-24.

Third, he also was responsible for ensuring that his shift had all necessary equipment to perform its functions. He would determine when products were needed, with or without assistance from his team leads, and travel to the "warehouse store" to "purchase" goods for his shift. Tiger Dep., pp. 92:15-93:13. These goods would be charged against his departmental budget. He also was instructed to make his shift run more efficiently at times by management. *Id*. at pp. 112:24-113:23. These facts also show that Plaintiff was afforded discretion on how to efficiently equip and stock products on his shift, which is exercising even more independent discretion on significant matters.

In this light, there can be no dispute that Plaintiff was engaged in the work of non-manual labor, devoted to the quality control efforts of Welspun, which required his discretion and independent judgment. Plaintiff was therefore properly classified as exempt pursuant to the FLSA's administrative exemption. As such, Defendants' Motion for Summary Judgment should be granted on this basis alone.

18

2. <u>Plaintiff was Exempt Under the Executive Exemption</u>.

In addition to being administratively exempt, Plaintiff's job duties also qualified as an Executive pursuant to the FLSA. The FLSA generally requires employers to pay employees a minimum wage for all hours worked and to pay covered employees overtime for working more than 40 hours in a week. 29 U.S.C. §§ 206(a), 207(a). However, the FLSA exempts many categories of employees from this requirement. *See* 29 U.S.C. § 213; *see also Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1138 (2018). "Whether an employee meets the requirements of the executive exemption when the employee performs concurrent duties is determined on a case-by-case basis and based on the factors set forth in § 541.700." *Buford v. Sup. Energy Srvs.*, 2018 WL 2465469, *10 (E.D. Ark. June 1, 2018) (citing 29 C.F.R. 541.106(a)).

The pertinent regulation provides that an "employee employed in a bona fide executive capacity" means any employee:

> (1) Compensated on a salary basis at a rate of not less than $455 per week[4] ..., exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement,

---

[4] *See* Footnote 2.

promotion or any other change of status of other employees are given

particular weight.

*Buford*, 2018 WL 2465469, at *8–9. "Generally, exempt executives make the decision regarding

when to perform nonexempt duties and remain responsible for the success or failure of business

operations under their management while performing the nonexempt work." *Id.* at *9. "In

contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt

work or performs the exempt work for defined time periods." *Id.*

Here, Plaintiff's job position as QC Supervisor easily meets the first three prongs under

the Executive exemption analysis.  First, he earned $65,000 annually.  *See* Argument, § IV.A.1.a,

*infra*.  Second, Plaintiff admits that his primary function was to supervise approximately 20

personnel on his shift, which far exceeds the requisite number for executive status.  *Id.* at pp.

44:22-45:1. Third, Plaintiff agrees that he was responsible for directly supervising the members

of his team and ensuring productivity.  *Id.* at pp. 98:1-100:1.

The fourth prong of the FLSA's executive exemption establishes the requirement that an

executive employee have "*the authority to* hire or fire other employees or whose suggestions and

recommendations as to the hiring, firing, advancement, promotion or any other change of status

of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4) (emphasis supplied).

"Factors used to determine whether an employee's suggestions and recommendations are given

particular weight include whether making such suggestions and recommendations is part of the

employee's duties and the frequency with which the employer's suggestions and

recommendations are relied upon." *Buford*, 2018 WL 2465469 at *10-*11 (citing 29 C.F.R.

§ 541.105). "An employee's suggestions and recommendations may still be deemed to have

'particular weight' even if a higher level manager's recommendation has more importance and

even if the employee does not have authority to make the ultimate decision as to the employee's

20

change in status." *Id.* (citing 29 C.F.R. § 541.105). Courts previously addressing what is required by the fourth element of the FLSA executive exemption "suggest that more than informal input is needed to prove applicability of the executive exemption." *Id.* (citing *Madden v. Lumber One Home Cntr., Inc.*, 745 F.3d 899, 904 (collecting cases)).

"Many different employee duties and levels of involvement can work to satisfy the fourth element." *Garrison v. ConAgra Food Packaged Foods, LLC*, 2015 WL 366431, *8 (E.D. Ark. Jan. 6, 2015) (citing *Madden,* 745 F.3d at 904). For example, "one way [an employer can show] that the purported executives' input into personnel decisions was given particular weight . . . is to show that the purported executives' input had more influence than hourly employees' input." *Id.* at 906. Other "[e]vidence that an employee's recommendation are given 'particular weight' could include witness testimony that recommendations were made and considered . . . and other documents regarding promotions, demotions or other change of status that reveal the employee's role in this area." *Id.* (citing *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees,* 69 Fed. Reg. 22122, 22135 (April 23, 2004)). "An employee who provides guidance on any one of the specified changes in employment status may meet the section 541.100(a)(4) requirement." *Id.* (internal citation omitted).

Again, the FLSA only requires that an executive actually have the *authority to* perform these duties.  *See* 29 C.F.R. 541.100(a)(4); *see also* U.S. DOL Op. Letter FLSA2009-6 (January 14, 2009)("Only if the [employee] in fact possesses *such authority* would the executive exemption apply.") (alteration and emphasis supplied).   Thus, Welspun need only provide evidence that Plaintiff and other QC Supervisors actually had the authority to perform the executive functions in order to satisfy its burden for purposes of summary judgment. Welspun anticipates that Plaintiff will argue that Welspun cannot satisfy the fourth prong. The evidence

21

shows, however, that Plaintiff in fact meets this element.

Plaintiff himself admits that he discussed employee advancement opportunities with his manager, Ragesh Sheth, which is confirmed by Mr. Sheth.  *See* Tiger Dep., pp. 103:14-104:7; Sheth Dec., ¶ 12.   Plaintiff also routinely disciplined employees, sending at least two home at his discretion, and he recommended that one employee be terminated, which also occurred.  *Id.*; *see also* Exhibits 7 (Employee Discipline Forms) and 8 (Employee Correspondence).  Plaintiff's attempts to downplay these issues does not lessen the fact that his position was authorized to terminate employees, subject to Human Resources' confirmation (which is good business practice), and he effectively gave recommendations for other personnel changes that were followed by management.

Plaintiff also recognizes that the brevity of his tenure with Welspun is a necessary factor in the frequency and breadth to which his recommendations were given particular weight.  Tiger Dep., 103:9-13.  As such, his counterparts, who worked in the same job position but on different shifts, certainly exercised this authority.  Blake Alban terminated an employee on his shift for insubordination, and he also recommended a team member for promotion, which was followed. *See* Alban Dec., ¶ 11. Similarly, Kaushik Rana has recommended employees for termination, which were followed, and he recommended one employee for promotion who subsequently received the promotion. *See* Rana Dec., ¶ 11; Sheth Dec., ¶ 13.  The evidence shows that QC Supervisors at Welspun, including Plaintiff, met all prongs of the Executive exemption under the FLSA.  Based on these facts, Plaintiff's claims should be dismissed in their entirety.

3.    Plaintiff Satisfied the FLSA's White-Collar Combination Exemption.

An employee also qualifies for exemption under the FLSA if he or she performs a combination of duties that are considered exempt under the FLSA's other exemptions. 29 C.F.R. § 541.708 ("employees who perform a combination of exempt duties as set forth in the

regulations in this part for executive, administrative, professional, outside sales and computer employees may qualify for exemption"). As detailed above, Plaintiff performed both administrative and executive duties as a QC Supervisor. Under the FLSA, these duties may be combined to establish Plaintiffs' exempt status. *See* 29 C.F.R. § 541.200; 29 C.F.R. § 541.708 ("an employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption.").

Accordingly, Plaintiffs were exempt under the FLSA and their claims should be dismissed with prejudice.

### B.    Plaintiff's Overtime Damages, if any, Should Be Calculated by the Fluctuating Workweek Method.

The fluctuating workweek method applies in misclassification cases when a court determines that a plaintiff who was treated as an exempt employee is, in fact, not exempt and is due overtime pay. *Smith v. Frac Tech Srvs., LLC*, 2011 WL 96868 (E.D. Ark. Jan. 11, 2011) (internal cites omitted) (finding that calculating unpaid overtime in misclassification exemption cases under the FLSA should utilize the fluctuating workweek method); *see Urnikis-Negro v. American Family Property Services*, 616 F.3d 665, 681-82 (7th Cir. 2010); *Pressler v. FTS USA, LLC*, 2010 WL 5105135 (E.D. Ark. Dec. 9, 2010); *Blackmon v. Brookshire Grocery Co*., 835 F.2d 1135, 1138 (5th Cir. 1988). The primary factual issue when deciding to apply the fluctuating workweek method is whether an employee's salary was intended to compensate for all hours worked or only for 40 hours. *See Frac Tech Srvs., LLC*, 2011 WL 96868 at *34-36.

Here, Plaintiff understood that his salary was intended to cover all of the hours he was required to work. Plaintiff received a pre-employment offer letter explicitly stating that he would be paid on a salary basis and that he was exempt. *See* New Hire Form, attached to Defendants' Motion for Summary Judgment as Exhibit 6. Plaintiff received Welspun's

Employee Handbook.  *See* Welspun Handbook Acknowledgements, Exhibit TT.  Welspun's Handbook states: "Overtime compensation is to be paid to all *non-exempt employees* in accordance with federal and state wage and hour requirements." *See* Welspun Handbook, Exhibit 9, p. 3 (emphasis added). It also states that salaried employees receive a bi-weekly salary amount for work performed that is intended to compensate salaried employees for all hours worked. *Id.* at p. 4.

Thus, the Court should use the method established in 29 C.F.R. § 778.114, known as the "fluctuating workweek method," for determining the amount of overtime, if any, owed to Plaintiff.  This method involves dividing the actual hours worked each workweek into the fixed salary and results in a determination of the regular rate of pay for that workweek.  *Id.*  The overtime payment for that week is then determined by multiplying all hours over 40 in a workweek, if any, by one-half the regular rate for that workweek.  *See id.*  The amount due will be the sum total of each workweek's overtime, if any.

Because the fixed salary for Plaintiff was intended to cover all of the hours worked, even if he exceeded forty (40) hours per week, 29 C.F.R. § 778.114 applies to determine the proper calculation of overtime pay.  The fixed workweek method recognizes the ability of an employer and an employee whose weekly hours fluctuate to agree that a fixed salary amount will serve as the employee's regular rate of compensation or "straight pay" (apart from overtime premiums) for any and all hours the employee works in a given week, regardless of their number.  *Id.*  As such, Welspun could only owe Plaintiff half of his regular rate of pay for any hours in excess of forty in workweek.

### C.     Plaintiff's AMWA Claim Also Fails.

Employees who are exempt from overtime compensation under the FLSA are not entitled to overtime compensation under the AMWA.  Ark. Code Ann. § 11-4-211(d).  As discussed

above, Plaintiff was properly classified as exempt from overtime compensation.  *See* Argument,

§ IV.A., *supra*.  Thus, his claim under the AMWA also fails at law. *See Zamam, LLC*, No. 2017

WL 5180427, at *2 ("Because the FLSA and Arkansas Minimum Wage Act impose similar

overtime requirements, and claims brought under parallel provisions of the acts should be

interpreted similarly . . . .").  Welspun respectfully requests that Plaintiff's AMWA claim be

dismissed along with his FLSA claim.

   Even if Plaintiffs are owed some overtime compensation, Plaintiffs damages under the

AMWA should be compensated by the same rate as the fluctuating workweek rate, as discussed

above, pursuant to Ark. Code Ann. § 11-4-218(a)(1)(B)(i); s*ee* Argument, § IV.C., *supra*.  The

Arkansas Department of Labor has explicitly adopted the federal regulation containing the

fluctuating workweek.  *See* Administrative Regulations of the Labor Standards Division of the

Arkansas Department of Labor, 010.14-109 ("For the purposes of determining and calculating

overtime pay requirements and what constitutes an employee's 'regular rate' of pay, the agency

adopts . . . the provisions of 29 C.F.R. 778 (July 1, 2005) as applicable.").  Further, Arkansas

courts look to the FLSA as persuasive authority where the AMWA is silent.  *See Helmert v.*

*Butterball*, 805 F. Supp. 2d 655, 663 fn. 8 (E.D. Ark. July 27, 2011) (citing 010.14.1 Ark. Code

R. § 112).  Because Plaintiff was compensated by salary for all hours worked, he would only

entitled to half-time pay over and above the forty hours worked each week, if any.  *See*

Argument, § IV.B, *supra*.

   **D. Welspun Pipes, Inc. and Weslpun USA, Inc. Never "Employed" Plaintiff.**

   The FLSA defines an "employer" as "any person acting directly or indirectly in the

interest of an employer in relation to an employee." 29 U.S.C. § 203(d).  The definition under the

AMWA is nearly identical.  Ark. Code Ann. § 11-4-203(4)(A) (any person or entity "acting

directly or indirectly in the interest of an employer in relation to an employee.").  The following

factors are considered for determining whether a separate entity is a "joint employer": (1) had the power to hire and fire the plaintiff; (2) supervised and controlled plaintiff's work schedules or conditions of employment: (3) determined the rate and method of payment; and (4) maintained plaintiff's employment records." *Schubert v. Bethesda Health Group, Inc.*, 319 F. Supp. 2d 963, 971 (E.D. Mo. 2004). Although the above-cited case is in reference to joint employment pursuant to the FLSA, because the definition of employer is, for all practical purposes, the same, a similar analysis should be made for joint employer determination under the Arkansas Minimum Wage Act.

Here, Welspun Tubular, LLC is the only named Defendant to admit that it employed Plaintiff for purposes of this lawsuit. *See* ECF No. 6, ¶¶ 17, 28, 33. Plaintiff has offered no evidence to establish that Welspun Pipes, Inc. or Welspun USA, Inc. was a joint employer of Plaintiff. Plaintiff's personnel file documents that Welspun Tubular, LLC was his employer. CITE. Simply put, Welspun Pipe, Inc. is a separate entity that was not involved in decisions relating to Plaintiffs' employment or compensation. *See* Sheth Dec., ¶ 4. Further, Plaintiff completely lacks any evidence indicating Welspun Pipe engaged in the type of activities considered for joint employment. Accordingly, neither Welspun Pipes, Inc. nor Welspun USA, Inc. was the "employer" of Plaintiff and, as such, they are each entitled to summary judgment on all of Plaintiff's claims.

## V.    CONCLUSION

Plaintiff has failed to create any genuine issue of material fact. Plaintiff was an exempt employee under the FLSA and AMWA and, therefore, he was not entitled to overtime pay. Even if a question of fact exits as to whether he was misclassified, Welspun acted at all times in good faith, and Plaintiff has failed to allege any facts sufficient to show that he is entitled to liquidated damages or that any back wages allegedly owed to him should not be calculated by the

fluctuating workweek method.  Accordingly, Defendants respectfully request that their Motion for Summary Judgment be granted in its entirety.

WHEREFORE, for the reasons contained herein, Defendants respectfully request that the Court grant their Motion for Summary Judgment and award Defendants all other relief to which they may be entitled.

Respectfully submitted,

J. Bruce Cross (#74068)
Missy McJunkins Duke (#99167)
Gregory J. Northen (#2011181)
CROSS, GUNTER, WITHERSPOON
    & GALCHUS, P.C.
500 President Clinton Avenue, Suite 200
Little Rock, Arkansas 72201
Phone:  501-371-9999 / Fax:  501-371-0035
E-mail:  bcross@cgwg.com
E-mail:  gnorthen@cgwg.com
**ATTORNEYS FOR DEFENDANTS**